**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **MICHAEL SESSA,** | § | |
| | § | |
| *Plaintiff,* | § | **CIVIL ACTION NO.** |
| **v.** | § | |
| | § | |
| **WELLS FARGO BANK** | § | |
| **N/A/,** | § | _____ |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

COMES NOW, Michael Sessa ("Plaintiff" or "Sessa"), and files this Original Complaint and Jury Demand and would respectfully show the following:

### I.

### PARTIES

1. Sessa is citizen of the United States and a resident of Dallas, Texas.

2. Sessa is a former Relationship Manager for Wells Fargo and venue is proper because Sessa has been subjected to unlawful employment practices committed at Wells Fargo's place of business in the State of Texas, Northern District,  Dallas Division.

3. The respondent, Wells Fargo, N.A. ("Respondent" or "Wells Fargo") is a financial services company that is organized under Delaware law, with its principal office in Sioux Falls, South Dakota.   Wells Fargo is a California corporation, conducting business in Texas in the Northern District, and elsewhere, and this action accrued in whole or in part at that place of business. Wells Fargo may be served by service on its registered agent: Corporation Service Company, 2111 East 7th Street, Suite 620, Austin, Texas 78701.

Plaintiff's Original Complaint and Jury Demand – Page 1

## II.

## <u>JURISDICTION</u>

4.  Jurisdiction of this Court is based on § 806 of the Sarbanes-Oxley Act of 2002, which creates a private cause of action for employees of publicly-traded companies who experience retaliation for engaging in protected activity.  *See* 18 U.S.C. § 1514A.

5.  Sessa originally filed this matter with OSHA, Department of Labor, Dallas, Texas, on or about June 11, 2019. On June 18, 2019, the DOL issued a determination dismissing the complaint, which Sessa timely appealed. The appeal is currently pending before Tracy A. Daly, Administrative Law Judge, Cause No. 2019 - SOX-00053. This matter has been pending more than 180 days with the Secretary of Labor and the delay is not due to bad faith of Sessa, and he therefore brings this action for de novo review.

## III.

## <u>FACTS</u>

A.  **Sessa is Hired and Demonstrates Strong Performance**.

6.  Sessa was hired by Wells Fargo in approximately April 7, 2018, in a financial consulting position. On June 4, 2010, Sessa was promoted to a position bringing in new business in the commercial strategies group and in October 2012, to a position in the retail financial division. In October 2015, Sessa was promoted to a position of Relationship Manager in the lender finance division.

7.  Sessa excelled during the time he worked for Wells Fargo. He received annual merit pay increases every year until he was in the Relationship Manager position. He also received yearly

bonuses for his successful job performance. Before he became Relationship Manager in 2015, he had received meets or exceeds expectations performance reviews.

### B.  ERS Problems Initially Found and Reported in 2015.

8.  In 2015, the Electronic Reporting System ("ERS") team at Wells Fargo began reporting directly to Jeff Carbery ("Carbery"), Head of Portfolio. The Relationship Managers in the lender finance division utilized the ERS system, which calculated the borrowing basis for their clients. The clients would provide Excel files with information related to loan eligibility and the ERS system would run the data and determine how much money could be borrowed.

9.  John Reniger ("Reniger"), Relationship Manager, identified that the ERS system was not calculating concentration ineligibles or limits correctly. Instead, the model was hardcoding "0s" rather than attempting to calculate limit ineligibles. The effect of wrongly calculating the borrowing basis is to misstate the customer's ability (i.e. the amount a customer can borrow). Misstating a customer's ability represented a credit risk to Wells Fargo as well as other banks participating in those loans. If Wells Fargo were to loan out more money that allowed by loan and security agreements and the loans went bad, such loans could result in loss of shareholder value. Also, clients who were not able to borrow as much as allowed by loan and security agreements might incur substantial costs obtaining funds they needed, affecting their profitability. Wells Fargo markets the ERS system as anti-fraud and as a benefit to clients as they do not have to calculate the figures themselves and clients rely on it to be correct.

10.  Reniger reported the issue to Russ Bonder, Portfolio Manager ("Bonder"), and Carbey. Reniger also worked with James Bailey ("Bailey), an Analyst on the ERS team, to address the issue but no action was taken to solve the issue.

### C.  Sessa became aware of further ERS risks and reports them to Wells Fargo.

11. In the fourth quarter of 2016 and into the first quarter of 2017, Sessa identified further ERS problems relating to all asset-based lending clients. ERS was still hardcoding 0's rather than attempting to calculate ineligibles, was miscalculating ineligibles, and not calculating concentration limits. This was the same issue Reniger had reported as to one of his clients, but Sessa determined the miscalculations were occurring as to information being provided to his clients Sienna and Encina. Concerned, Sessa further checked and determined that all asset-based lending clients had the same issues in the ERS system.

12. Sessa, who reasonably believed that the ERS issues constituted a violation of bank fraud, securities fraud, a rule or regulation of the Securities and Exchange Commission, and/or provisions of Federal law relating to fraud against shareholders, reported the issue to Tami Barrows ("Barrows"), Portfolio Manager, who indicated she was unaware of ERS issues. Although she agreed with Sessa's concerns that the significant miscalculation represented a credit risk, Barrows did not want to raise the issue with Carbery because one of the client's used to be hers and she thought it would make her look bad that she had not noticed the issues. Barrows also expressed concern that reporting it would result in negative ramifications to her. Sessa responded that since the ERS affected all of Wells Fargo's lenders, and was causing a potential systemic credit risk, that bringing up the issue to be resolved should be rewarded and not punished.

13. Sessa then discussed with matter with Carbery, who falsely claimed he did not know anything about the alleged ERS issues, despite the fact they had been brought to his attention by Reniger in 2015.  Carbery directed Sessa and Barrows to work with the ERS team to help address the ERS issues. Sessa suggested a new field exam policy to check one additional day per exam. Barrows and Carbery agreed it was a good idea and directed Sessa to employ it on future field

exams, but this was not done because when Sessa made the request to the field exam team they pushed back against it claiming it was too much work. Eventually, Barrows and Carbery halted any attempt to address the issues.

14. Sessa then suggested that new clients not be put on ERS and said if the issues could not be addressed that the clients should be pulled off ERS. Barrows and Carbery agree not to put new clients on ERS but would not agree to remove old clients, instead indicating they would let clients roll off over time via customer churn. Barrow and Carbery expressed they did not want to raise the concerns to Andrea Petro, ("Petro"), Division Manager for Lender Finance. Sessa expressed further concern to Barrows that ERS remained an issue and Barrows said he should look the other way and ignore the problem, but that he was still responsible for the borrowing base numbers being correct.

### D.  Wells Fargo retaliated against Complainant for his protected activity.

15. From the point that Sessa made reports about the ERS system problems, Sessa's relationship with Barrows and Carbery was never the same, as they undertook a course of retaliatory treatment against him.  Sessa raised concerns about the ERS system several times in 2017, and Barrows continued to tell Sessa he was digging into the numbers too much and it was taking too much time and that he should look the other way. She also said she could not be bothered to read Sessa's emails about ERS problems and did not want to talk about it anymore.

16. In approximately the summer of 2017, after one of the times Sessa brought ERS issues to her attention, Barrows came to Sessa and verbally counseled him based on an alleged formal complaint by Tigist Shiferaw ("Shiferaw"). Barrows said that the complaint had been submitted to Shiferaw's manager, Cory Fryling ("Fryling"), who had told Carbery about it. Supposedly, Shiferaw had complained about the way Sessa spoke to her, but Barrows admitted

she did not know what Sessa allegedly said. The day after he received the counseling, Sessa apologized to Shiferaw, but she said he did not know why he was apologizing as she did not have any issues with him and did not submit a complaint.

17. Shiferaw then went to Barrows and denied making the complaint and Barrows claimed the complaint must have been from Jason Ridge, the former manager of the ERS team that had just resigned. Neither Barrows or Carbery had bothered to talk to Shiferaw before counseling Sessa.

18. In October 2017, after Sessa's further complaints about the ERS system, Wells Fargo moved the ERS team from the lender finance division where it reported to Carbery, to reporting to Katie Marrs ("Marrs"), who headed the larger ERS Team for Wells Fargo. At the time of this change, Sessa discussed the ERS issues with Marrs. Initially, Marrs indicated she would work with Carbery and Cyndi Giles ("Giles"), Division Manager for lender finance who had replaced Petro, and others to address issues that Sessa brought to her attention.

E. **Wells Fargo Further Retaliates Against Sessa**.

19. In January 2018, Sessa applied to an underwriting position on the Lender Finance team. Before doing so he spoke to Scott Branch ("Branch"), Team Manager for the underwriting team. Branch encouraged him to apply but asked him to get Barrows to agree that he could apply. Sessa spoke with Barrows, who initially recommended that he apply for the position, stating he would be a good fit due to his very strong credit skills. However, a few weeks later Barrows called Sessa into her office and said he was not allowed to apply for the position because of the negative information that she was going to put in his performance 2017 review, which would be given in March 2018.

20. On March 6, 2018, Sessa was given a performance review by Barrows, and they met face to face about the review on March 28, 2018. The performance review contained the same untrue allegation that Shiferaw had submitted a formal complaint about Sessa as well as untrue allegations about a number of other performance issues. That same day, Sessa received another email asking him to acknowledge receipt of his annual performance review, but the review attached to this email was different and much worse than the one he was provided previously and had been given and discussed with Barrows. Due to his 2017 and 2018 performance reviews, Sessa did not to receive a raise and also his bonus was substantially reduced.

21. Sessa subsequently found out that Mark Weide ("Weide"), Sessa's peer and a Relationship Manager on Barrows' team, had received the underwriting position. Weide had less tenure with Wells Fargo and less experience than Sessa and had not been familiar with the ERS system issues. Sessa also had a more diverse background than Weide, including regarding new business development.

G.     **Sessa Makes Further Complaints about the ERS Issues**.

22. Beginning in January 2018, Sessa had been building his own ERS model and identified additional ineligibles that it was failing to calculate properly or not calculating at all in Encina's borrowing base. On March 29, 2018, Sessa raised additional concerns about the ERS issues to Giles as well as concerns about the negative information in his performance review that had been discussed with him by Barrows the day before. Giles said she would again consider the ERS system issues. In a subsequent meeting with Giles, Sessa gave her documentation substantiating his problems with the unfair performance review.

23. In a meeting following his giving the materials to Giles, she told Sessa she had investigated the allegations in performance review and spoke with everyone on the ERS team, including

Fryling. She said she could not conclude what had happened as too much time had passed and it was a "he-said/she-said" situation." Giles said the review was effectively "null and void" and would not impact Sessa's ability to apply for jobs at Wells Fargo. Sessa expressed concern about whether that was true, as it had already preemptively stopped him from applying to the underwriting position.

24. Following this discussion, Sessa learned that Giles had not investigated his complaints about his performance review with all the people involved, as Bailey confirmed Giles had not spoken to him. Due to concerns about Giles being untruthful, Sessa complained to both the Ethics and Whistleblower hotlines at Wells Fargo about the ERS credit risk issues and his and concerns about the retaliatory hostile work environment.

25. Sessa spoke with Lavanh Lo and then Shannon Claytor, who he understood were both attorneys in ER. Sessa said that Giles had represented that his annual review was "null and void" and would not impact his ability to apply for jobs in Wells Fargo. ER said that Giles had never contacted them or HR about his annual review being null and void. ER confirmed that Giles could not make the statement that the review was "null and void" or that it would not affect his ability to apply for jobs within Wells Fargo.

26. After speaking with ER, Sessa spoke with Shiferaw's supervisor Fryling, who confirmed that neither Giles or Carbery had spoken with him. Fryling also stated that Shiferaw had not filed a formal complaint about Sessa and expressed the opinion that allegations about such an alleged complaint should be removed from Sessa's performance review. Fryling further told Sessa that he did not even know who Giles was.

27. In May 2018, Giles and Carbery moved Sessa to the team of Bonder, telling him it would give him a "fresh start." After being moved, Sessa spoke to Bonder about his concern over

calculation errors in the ERS system. Bonder responded that he was unaware of issues with ERS, which was inaccurate as he had been one of the persons to first receive a complaint about the ERS system in 2015 from Reniger, and he was also aware of previous complaints of Sessa about the issues.

28. After Sessa brought the ERS problems to Bonder's attention, Bonder told Sessa he could not use the team credit analyst, Spencer Williams ("Williams"), allegedly because Sessa was a RM3, not an RM4. However, Bonders allows other RMs who are junior to Sessa to utilize Williams. At the time Bonder told Sessa this, Williams was being so underutilized that Bonder was allowing him to support Relationship Managers on other teams. Bonder also told Sessa that he was prohibited from communicating with the ERS system without going through Bonder first.

29. On June 1, 2018, Giles emailed Sessa and summoned him to her office. When Sessa went to meet her, Carbery was there as well. She confronted Sessa and said she was not happy he had called Fryling due to it being a "disruption" in the office, and she also said she thought the issues about the performance review had been put behind them. Giles and Carbery again indicated to Sessa that he should not get so much into the details of the borrowing base and it was a "time management" issue as the ERS issues were immaterial.

Carbery stated that Sessa was doing an awesome job as Relationship Manager, and he and Giles again indicated that moving Sessa to Bonders' team was supposed to allow him start with a clean slate. However, just three days later, Giles gave Sessa an informal warning for recording the conversation in her office, even though she had not said anything about not allowing him to record the meeting.

F.  **After Further ERS Complaints Sessa Suffers Further Retaliation**.

30. In July 2018 and numerous thereafter in 2018, Sessa had further conversations with Carbery asking to utilize Williams, but although he agreed that Sessa should be able to utilize Sessa, he indicated he did not want to get involved.

31. On August 24, 2018, Sessa received his mid-year review from Bonder. Carbery was also present, which was not standard practice at Wells Fargo. Bonder accused Sessa of aggressively lunging at Carrie Rhoades, an Analyst, during a meeting and physically threatening her. The meeting referred to had occurred on July 26, 2018, and Bonder never mentioned an alleged issue about this meeting previously. In any event, Sessa had not lunged at Rhoades in any meeting. Following this meeting Bonder emailed Sessa a verbal warning, alleging Sessa was not meeting performance expectations, but he did not mention any alleged physical threats of Rhoades.

32. On October 5, 2018, Bonder provided Sessa a "follow-up" mid-year review. To Sessa's knowledge no other employee was receiving a "follow-up" review. Carbery also attended this meeting, in which Sessa requested additional support. Following this meeting, Sessa addressed the concerns he had about further retaliation to Claytor, ER attorney.

33. In October 2018, Sessa also asked Carbery for more support again after his mid-year review, and while Carbery agreed Bonder was mismanaging Williams and Sessa should get support, he said again he would not get involved. Year over year from 2017 to 2018, the pre-tax income on Sessa's accounts increased more than 72%, while the entire Lender Finance division only increased by 1.4%. This indicated that Sessa's accounts had a strong need for support because his accounts were so active.

34. Throughout 2018, Sessa was repeatedly told by Giles and Carbery that the issues with ERS system were immaterial. They told him he was hard working and one of the team's best

Relationship Manager, but that he needed to work on his "time management" skills and quit looking into the accuracy of the ERS system numbers.

35. After being moved to Bonder's team, Sessa raised issues about Bonder having memory problems to Giles, who admitted it was a known problem. For example, when Bonder had to work from home for a few days and go get an MRI due to back issues, Bonder could not remember emails Sessa sent him and said he assumed Sessa was on paid time off. Sessa advised Giles and ER of the issues, but despite the acknowledgement of Bonder's memory issues, as noted *infra*, she later inputted negative information about Sessa supposedly not advising Bonder of his paid time off. Giles inputted this information despite the fact Sessa had provided documentation to her showing that he had communicated the time off with Bonder.

36. In October 2018, it was announced that Bonder was accepting a demotion to a position on the underwriting team. Giles had HR post Bonders' position on the Wells Fargo internal job website. In November 2018, Sessa applied for Bonder's Portfolio Manager position. Giles and Carbery subsequently scheduled a telephone interview with Sessa for the position, despite the fact they office on the same floor with him.

37. On December 20, 2018, Giles gave Sessa a formal corrective action saying Sessa had shown offensive pictures to co-workers. The picture he had shown was of himself dressed like an elf during a pub crawl. Due to Wells Fargo policy concerning corrective actions, it would require Sessa to tell any hiring manager at Wells Fargo that he showed offensive pictures at work, thereby likely making it impossible for him to get another position at the company. At the time she issued the corrective action, Giles had not even seen the picture and she stated it was "irrelevant" and said someone had complained. She also stated that it was irrelevant because anyone can find anything offensive for any reason.

38. Sessa complained about the corrective action to ER following his receipt of it. ER disagreed with Giles that the picture should support a disciplinary action and they turned the action into an informal warning. Sessa advised the ER contact, Tamie Pfaff ("Pfaff"), who he believed to be an attorney with ER, that he wanted to appeal that determination. She said an appeal would just go to her manager, who she had already discussed the matter with, so it would not change the outcome. Sessa provided Pfaff with a list of people he had shown the picture to and she told him that she had spoken to everyone on the list. Sessa knows this is incorrect as he has checked with several people that saw the picture and they indicated she had not spoken with them.

39. On December 21, 2018, Sessa was notified via email that he was not going to get the promotion he applied for. Sessa was told they wanted someone experienced in managing people. Sessa is a former Captain in the U.S. Army and had substantial experience managing people in the Army. Sessa was advised that underwriter Chad Ramsey ("Ramsey"), had gotten the position. Sessa does not believe Ramsey had any management experience. As a result of not getting the promotion, Sessa lost out of substantial pay and bonus opportunities.

40. In January 2019, Carbery was involuntarily terminated and Giles was moved to a different position. On February 5, 2019, Sessa was advised that ER had completed an investigation into his complaints to Whistleblower and Ethics, and they told him that Carbery had violated Wells Fargo policies but had not retaliated. They also advised Sessa that they would not tell him what policies were violated and that he could not see the report.

41. In February 2019, Bonder switched positions with Ramsey, and Sessa thereafter reported to Ramsey. Ramsey told Sessa that he has the busiest accounts in all of lender finance and promised to get in more support. Ramsey stated he was going to move one of the high-touch

accounts to Reniger and designated that account as BAM Capital. The CFO for BAM Capital advised Ramsey he does not want Sessa removed.

42. On March 20, 2019, Giles met with Sessa regarding his 2018 performance review. Because Bonders had supervised him for most of 2018, under company policy he should have performed the review. The review contained substantial untrue negative information about Sessa. Ramsey, who also was in the meeting, gave Sessa a Performance Improvement Plan ("PIP"), indicating he needed to improve his job performance. Afterwards, Ramsey admitted to Sessa that he had just written on the PIP what he had been told to write.

43. For example, the performance review stated that BAM Capital, one of Sessa's accounts, stating that they had made a formal complaint about some financial problems he had pointed out. Indeed, BAM Capital's CFO and COO thanked Sessa for his assistance he had provided on the account. The inputting of this information was retaliatory, as Sessa had been advised by the CEO of BAM Capital that there had not been a complaint against Sessa, and if there had been a complaint it would have been against Bonder. Bonder had failed to take actions which caused BAM Capital not to be able to complete a large acquisition that would have doubled its size, and Sessa had complained about it to Giles.

44. The 2018 performance review further contained other negative untrue allegations, including that he had a complaint from Pipeline Business Credit. When Sessa approached the company about whether there had been a complaint about him, they denied anyone indicating a problem with Sessa.  Due to negative performance evaluation, Sessa earned very substantially less in bonus than what he otherwise would have been entitled to.

45. In March 2019, Marrs, who had been tasked with additional review of the ERS system, met with the lender finance team about issues with ERS. Marrs subsequently spoke with Sessa on

the telephone, since he could not attend the meeting. Marrs had assigned Adam Van Cleave, an Analyst who was  associated with the ERS team, to look into ERS issues. Marrs indicated to Sessa that Giles had been aware of all the ERS issues but did not share the information with the lender finance team. Marrs stated that as a result of her review the team was going to issue a "self-identified corrective action" relating to numerous concerns because they did not have confidence in the calculations. Marrs further indicated that Carbery's heading of the ERS team was a conflict of interest.

46. On March 20, 2019, Sessa was advised by Markelia Weaver, an investigator in ER, that Sessa's Ethics and Whistleblower complaints had been investigated and that Wells Fargo would be addressing a number of concerns.

47. On March 29, 2019, Ramsey attended a meeting with Sessa's client Encina. Ramsey advised Encina that ERS was a major credit risk as it had been understating the amount the customer could borrow. Ramsey confirmed that Sessa knew how to calculate the borrowing base better than anybody in all of lender finance, and confirmed Sessa was the person who had identified the problem.

48. In April 19, 2019, Sessa attending a meeting at BAM Capital's office in Atlanta to introduce Reniger as the new relationship manager and to have Ramsey meet BAM's management team. At that meeting BAM Capital confirmed it was Bonder's decisions that had caused the acquisition the previously year to fall apart.

49. On June 5, 2019, due to the ongoing retaliatory environment at Wells Fargo, and the loss of income caused by the refusal to promote him and the loss of merit increases and bonuses from negative performance reviews, Sessa was constructively discharged from Wells Fargo. Sessa submitted his resignation, which is effective June 19, 2019.

50. Although Sessa obtained alternative employment commencing in July 2019, his anticipated income will be substantially lower than if he had received the promotion to Bonder's position and merit increases and bonuses than what he should have been entitled to.

## IV.

### § 806 of the Sarbanes-Oxley Act

51. Sessa incorporates paragraphs 6 through 50  as though fully set forth herein.

52. Section 806 of the Sarbanes-Oxley Act (SOX) creates a private cause of action for employees of publicly-traded companies who experience retaliation for engaging in protected activity. *See* 18 U.S.C. § 1514A.

53. The statute states, in relevant part, that "[n]o [publicly-traded company] … may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] § 1341, 1343, 1344 (bank fraud), or 1348 (securities fraud), any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by … (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); … ."

54. In order to establish such a claim, an employee must prove (1) that he engaged in protected activity, (2) his employer knew she engaged in that activity, (3) he suffered an unfavorable

personnel action, and (4) the protected activity was a contributing factor in the unfavorable action.

55. In this case, Sessa can establish a claim of SOX retaliation.  He engaged in protected activity when he repeatedly brought concerns about the ERS System to his supervisors and managers, as noted *supra*.  There is no question that Wells Fargo knew that this concern was voiced by Sessa, since he brought this concern to the attention of many people at Wells Fargo, including Barrows, Carbery, Giles, Bonder, and Ramsey, as well as both HR and ER.

56. Shortly following his protected activity, a pattern of retaliatory conduct referenced *supra*, occurred. Supra was given inaccurate negative performance reviews; denied merit increases and bonuses; targeted for unwarranted disciplinary action and a PIP; denied promotions, and finally, he was constructively discharged. The close timing between Sessa's protected activities and the negative treatment toward him is compelling evidence of retaliation, as were determinations made by HR and ER indicating the lack of basis of some of the actions taken against him.

57. As set forth *supra*, Sessa engaged in protected activity, including, specifically, the following:

   a. In the fourth quarter of 2016 and into the first quarter of 2017, Sessa identified that the ERS system was hardcoding 0's rather than attempting to calculate ineligibles, was miscalculating ineligibles, and not calculating concentration limits, as to all asset-based lending clients.[1] Sessa reported the issue to his superiors, Barrows and Carbery, and suggested that new clients not be put on ERS and said if the issues could not be addressed that the clients should be pulled off ERS. Barrows and

---

[1] As noted, the effect of wrongly calculating the borrowing basis is to misstate the customer's ability (i.e. the amount a customer can borrow), which represented a credit risk to Wells Fargo as well as other banks partidcipating in those loans.

Carbery agreed not to put new clients on ERS but would not agree to remove old clients, instead indicating they would let clients roll off over time via customer churn. Barrow and Carbery expressed they did not want to raise the concerns to Division Manager for Lender Finance Petro.

b. Sessa raised concerns about the ERS system several times in 2017.[2] Barrows told Sessa to quit digging into the numbers and not to communicate with her anymore about the issues.

c. Beginning in January 2018, Sessa identified additional ineligibles that the ERS system was failing to calculate properly or not calculating at all, and on March 29, 2018, Sessa raised additional concerns about the ERS issues to Division Manager for Lender Finance Giles.

d. In or around April 2018, Sessa complained to both the Ethics and Whistleblower hotlines at Wells Fargo about the ERS credit risk issues and his concerns about the retaliatory hostile work environment.

e. In May 2018, Sessa complained to Portfolio Manager Bonder about his concerns over calculation errors in the ERS system.

f. In December 2018, Sessa complained to ER that a corrective action he was given by Giles was retaliatory for his complaints about the ERS system issues.

g. In March 2019, Sessa discussed his complaints about ERS issues with Marrs, Head of the Larger ERS Team, who admitted that after review there were numerous concerns that she had about the ERS system due to not having confidence in the calculations.

---

[2] Sessa needs to engage in discovery to determine exact dates as to all complaints.

    h.  In March and/or April 2019, Sessa complained to Giles about untrue information inputted into his performance review for 2018 and submitted an official complaint in writing to Wells Fargo Employee Relations through a designated page on their website per Wells Fargo policy. In addition to asking them to look into the inaccuracies on his annual review, Sessa asked for his salary and bonus to be re-evaluated. Sessa further notified Ramsey about the inaccuracies.

58. After Sessa engaged in protected conduct, Respondent took adverse actions against Sessa, including, specifically, the following:

    a.  After's Sessa's complaints about the ERS system in approximately the summer of 2017 to Barrows, she verbally counseled him for an alleged formal complaint by Tigist Shiferaw, and the next day Sessa was told by Shiferaw that no such complaint had been made.

    b.  After complaints about the ERS system in January 2018, Sessa applied to an underwriting position on the Lender Finance team, and after first stating he would be a good fit, Barrows called Sessa into her office and said he was not allowed to apply for the position because of the negative information that she was going to put in his performance 2017 review, which would be given in March 2018. Barrows then provided him a performance review that contained untrue allegations, and as a result Sessa did not to receive a raise and also his bonus was substantially reduced. Sessa subsequently found out that a peer with less tenure and less experience received the job position he had sought but not been allowed to apply to.

    c.  After Sessa brought the ERS problems to Bonder's attention in May 2018, Bonder told Sessa he could not use the team credit analyst, Spencer Williams, despite the

fact other Relationship Managers were allowed to do so. In early June 2018, three days after discussions with Sessa in which Giles told him not get so much into the details of the borrowing base in regard to the ERS system, Giles gave Sessa an informal warning for recording the conversation in her office, even though she had not said anything about not allowing him to record the meeting.

d.  On August 24, 2018, in a meeting with Sessa regarding his mid-year review, Bonder accused Sessa without basis of aggressively lunging at a female employee and physically threatening her, and following this meeting Bonder emailed Sessa a verbal warning alleging Sessa was not meeting performance expectations.

e.  After Giles gave Sessa a formal corrective action about an alleged offensive picture, which was unsupported on December 20, 2018, he immediately complained to ER that he felt it was retaliatory due to his complaints about the ERS system. The next day he was was notified via email that he was not going to get the promotion he applied for to Portfolio Manager, and he found out later that it was given to a peer with less management experience, causing him a very substantial loss of pay and bonus opportunities.

f.  On March 20, 2019, Giles gave Sessa his 2018 performance review, which contained substantial untrue negative information about Sessa, and Sessa was  also given a Performance Improvement Plan ("PIP").

g.  On June 5, 2019, Sessa was constructively discharged from Wells Fargo.

**REQUEST FOR RELIEF**

59. Sessa has no plain or adequate remedy at law to correct the wrongs complained of herein, and has thus instituted this suit for damages, including compensatory and punitive damages,

declaratory relief and injunctive relief provided for under §806 of the Sarbanes-Oxley Act. Further, Sessa is now suffering and will continue to suffer irreparable injury from Company's policies, practices, customs, and usages, set forth herein.

60. Sessa respectfully requests that this Court grant him "all relief necessary to make the [him] whole," which includes back pay with interest, front pay, "make-whole" relief, special damages for emotional distress and loss of professional reputation, and attorney's fees and costs. 18 U.S.C. §1514A(c)(1).

Respectfully Submitted,

/s/ Jane Legler
Jane Legler
Texas Bar No. 03565820
Christine Neill
Texas Bar No. 00796793
Kyla Gail Cole
Texas Bar No. 24033113

Neill Legler Cole PLLC
3141 Hood Street, Ste. 200
(214) 748-7777
(214) 748-7778 (facsimiles)
christine@nlcemployeelaw.com
jane@nlcemployeelaw.com
kyla@nlcemployeelaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 16, 2020, a true and correct copy of the foregoing was served via email on counsel for Defendant:

Jeremy Hawpe
Littler
2001 Ross Avenue, Suite 1500
Lock Box 116
Dallas, Texas 75201-2931


/s/Jane Legler

_____

Jane Legler